CROCKER *v.* CITY OF NEW YORK and others.

*(Circuit Court, S. D. New York.   1883.)*

1. **WHARF FRANCHISE—CITY GRANT—RIGHTS OF GRANTEE.**

   Where a city had full power derived from the state to establish wharves and to cause them to be erected by the owners of the adjacent property, and to grant the right to receive and collect wharfage, but was restrained from conveying the land in controversy by an act of the legislature, and the restricting act was subsequently repealed, with a proviso enacted that no grants should be made beyond the exterior line fixed by statute, and it granted to the orator the land of which he was riparian owner to the exterior bulk-head line, as fixed by the legislature, upon which, by the terms of the indenture, he was required and covenanted to build a wharf, with the right to collect wharfage and cranage advantages by or from that part of the exterior line of the city, but the grant was not to be construed as a warranty of seizin, or to operate further than to pass the title or interest the city may lawfully have or claim by virtue of its charter and the various acts of the state legislature, *held*, that a preliminary injunction may issue to restrain the city from building permanent structures outside of the orator's wharf, which structures would have the effect to cut plaintiff's wharf wholly off from the navigable waters of the river and destroy his right to collect wharfage and cranage at his wharf without making compensation therefor.

2. **SAME—RIGHTS UNDER CONTRACT CANNOT BE DIVESTED.**

   Where the state legislature fixed the exterior line of the city, and left the city with authority to grant wharves to that line, and expressly declared that there should be no solid filling beyond that line, the act of the legislature is a part of the consideration for the purchase of the land and the building of the wharf, and the city cannot divest rights which have accrued under its contract without just compensation therefor.

In Equity.

*Stephen A. Walker* and *Henry H. Anderson,* for orator.

*James C. Carter,* for defendants.

WHEELER, J. This cause has been heard on the motion for the preliminary injunction to restrain the defendant from building new wharves in front of the orator's wharf in North river, between Twenty-sixth and Twenty-seventh streets, in the city of New York. The facts are not much, if at all, in controversy. The state owned the land under the water where the orator's wharf is, and about it. The corporation of the city had full power derived from the state to establish wharves, and to cause them to be erected by the owners of the adjacent property, and to grant the right to receive and collect wharfage, but was restrained from conveying this land by the act of the legislature of March 13, 1855. This appears from various acts of the legislature and from the answer. Act of 1798, §§ 1, 2; Act of 1813, §§ 220–224; Valentine, Laws, 1286, 1292, 1294.

By the act of April 17, 1857, a bulk-head line of solid filling was established, beyond which it was enacted that it should not be lawful to fill with solid material, or to erect any structures except piers of certain length, with intermediate spaces of prescribed width. Val. Laws, pp. 1308, 1309, §§ 1, 2. By the act of April 19, 1858, the restriction upon conveying in the act of 1855 was repealed, with a proviso enacted that no grants should be made beyond the exterior line fixed by the act of 1857. Val. Laws, 771. By indenture made between the mayor, aldermen, and commonalty of the city and Conrad Long, the orator's grantor, dated October 22, 1858, the former, in consideration of $2,962.50, granted, bargained, sold, aliened, remised, released, and conveyed to the latter this land between Twenty-sixth and Twenty-seventh streets, and land of which he was riparian owner, and the exterior bulk-head line of the act of 1857, upon which, by the terms of the indenture, he was required and covenanted to build a wharf, and they covenanted that he should at all times thereafter receive and hold to his own use "all manner of wharfage, cranage, advantages, or emoluments growing or accruing by or from that part of said exterior line of said city;" and it was further therein agreed "that this present grant, and every word and thing in the same contained, shall not be construed to be a covenant or covenants of warranty or seizin of the said parties of the first part, their successors, or to operate further than to pass the estate, right, title, or interest they may have or may lawfully claim in the premises hereby conveyed, by virtue of their said charters and the various acts of the legislature of the people of the state of New York."

The wharf was built upon the established bulk-head line pursuant to the indenture, and has, with its incidents and rights, passed to the

orator. By letters patent of the state dated September 28, 1871, all the property, right, title, and interest of the people of the state of New York in the land covered by water of the North or Hudson river, lying within and easterly of an exterior line, which includes all these premises, was given, and granted unto the mayor, aldermen, and commonalty of the city, pursuant to the act of April 5, 1870, as amended by the act of April 18, 1871. The defendant corporation, and the other defendants composing the board of the department of docks of the city, under this provision of the act of 1871, were about to erect wharves and permanent structures outside of the orator's wharf, between it and the channels of the river, which would cut it wholly off from the navigable water of the river, and destroy the right to collect wharfage and cranage at his wharf, without making compensation therefor, until restrained pending this motion.

At the time of the grant to Long, the city did not own the land under water next to the bulk-head line which the indenture covered; but when it is conceded or shown that the city did have the right to locate wharves and to cause them to be erected by the riparian owners, and to collect or grant the right to collect wharfage, it follows that the grant of the city was good to pass the right to erect this wharf and to collect wharfage thereon. And what the city did not own the state owned, and could grant by any instrumentality which the legislature should see fit to make use of; and the repeal of the restriction of the act of 1855, with the proviso that conveyances should not be made extending beyond the bulk-head line, implied that those authorized to convey before the restriction should thereafter have the right to convey to the bulk-head line, as the city undertook to do. The state has, of itself, asserted no right there against Long, or against the grant of the city. The grantee made large expenditures under the grant, and the city cannot justly be heard now to say, in its own behalf, that it did not have the right to grant what it undertook to grant and was paid for granting.

The right of the orator to the wharf appears to be well established, so that he is the proprietor of it to all intents and purposes, subject, however, to the right of the law-making power to regulate it on account of its public character. This must include the right to collect wharfage and cranage, and to all the emoluments pertaining to the use and enjoyment of the wharf, as it was made and intended to be used, under such regulations as should be established for its use. The city did not own any land outside of the bulk-head line at that place, and had no right to convey any land there for wharf purposes; all

there was left belonged to the state or to Long. He took nothing but the right to the wharf and its emoluments. It is argued for the defendants that this was only the right to the wharf itself, and the right to collect wharfage while it could be used as a wharf; and that whenever the state, as owner of the soil under water in front of it, should make such use of that soil as to prevent the use of the wharf for wharf purposes, his rights in that direction would end. It is true that the grant was of nothing beyond the wharf. Long had no rights outside the wharf. But he had the right to the wharf as a wharf on navigable water, and the right to collect the wharfage upon it. The public had the right to come to his wharf and employ it. The character and usefulness of his property as granted to him would be taken away if they should be prevented from coming. They could not be prevented without derogating from his grant. This franchise is like that of a ferry or a turnpike or a railroad. The owners of a ferry take only the right to land. Their right to cross comes from the navigability of the water which is common to all. The grantors of the ferry could not shut the public out from it without infringing upon the rights of the grantees. The grantor of a right to a turnpike or railroad could not hedge it about so as to exclude the public from it without derogating from the grant. This grant of this right to build a wharf and take wharfage on it can be understood to mean no less than that the public should have the same right of access to it as then existed. The indenture, taken all together, is a quitclaim and not a warranty deed of the property, but it is a quitclaim of all that it assumes to cover, which includes the right to collect wharfage and cranage, and the right to the opportunity to have them to collect. The city cannot have the right to take away what it has so solemnly granted.

The transaction by which Long acquired the right to construct his wharf and receive his profits constituted a contract, and were participated in by the state, as well as by him and the city. The authority of the city to make this grant of this land and right was derived wholly from the state. It did not result merely from a grant of the land from the state to the city, for the city to grant as it should see fit, but it came from power to grant what was the state's property until the grant should be made.

Thus the state was a party to the grant, as if made by any other instrumentality. Then the state, by the act of 1857, fixed the exterior line and left the city with authority to grant wharves to that line, and expressly declared that there should be no solid filling beyond that

line. Act of 1857, §§ 1, 2. This act was a part of the transaction and entered into the contract for the wharf, and was a part of the consideration for purchasing the land and building the wharf. That act made the wharf an exterior wharf. The city, through its officers, is now professedly acting under the authority of the state, conferred by the act of 1871, and is undertaking to make the wharf an interior wharf. The object is not merely to create rival wharves, which merely draw away the custom from this one, but it is to cut this wharf entirely away from its custom. This the state could not do, if it undertook so to do, as has been with fairness fully conceded by the counsel for the defendant, if this would be the effect. The argument is that there was no private right which this course could cut off; not that it could in any manner be cut off if there was one. The legislature has not, however, undertaken to take away any private right without making compensation, but has carefully provided, in the acts of 1870 and 1871, under which the commissioners are acting, for making compensation for all such rights necessary to be taken.

The question is not, therefore, whether private rights can be taken without compensation, but whether there is a private right proposed to be taken. If the question was whether a rival wharf, which would merely draw away custom, could be erected, it would be like that in *Charles River Bridge* v. *Warren Bridge,* 7 Pick. 344, and 11 Pet. 420, which was so much considered by those courts. In that case, although it was held by a majority of each court that a merely competing bridge did not take away any right acquired by the grant of the right to build, and take tolls for passing over, the first bridge, against a strong minority who would hold that it did, no one of the judges of either the majority or minority of either court seems to have doubted but that the obstruction of all travel, for which toll was taken, would have taken away such a right. In that case the bridge might have been left intact, valuable as it could be for anything but a toll bridge, but valueless for that, the same as here the wharf would be left valueless as a wharf, for which it was built, although it might be valuable to some extent for other purposes.

These conclusions are supported by the decision in *Langdon* v. *The Mayor,* in the supreme court of New York, May, 1882, and *Van Zandt* v. *The Mayor,* 8 Bosw. 375.

There are many provisions in the charters of the city, acts of the legislature of the state, grants by the city, and courses taken and policies pursued by the authorities of the city, in relation to the

wharves of the city, which have been collected with great research and instructively presented by counsel, but none of them control or materially vary the principal facts which have been referred to in respect to this particular wharf, therefore it is not deemed to be needful or useful to further refer to them.

The motion is granted.